406 S.E.2d 52

**Edward P. TWIGG, Jr.**

v.

**HERCULES CORPORATION.**

**No. 19501.**

Supreme Court of Appeals of
West Virginia.

July 26, 1990.

Dissenting Opinion of Justice
Brotherton June 7, 1991.

David H. Webb, Staggers and Webb,
Keyser and Robert M. Bastress, Jr., Mor-
gantown, for Edward P. Twigg.

Charles Q. Gage and L. Anthony George,
Jackson & Kelly, Charleston, for Hercules
Corp.

WORKMAN, Justice:

This case is before the Court to answer a
certified question posed by the United
States District Court for the Northern Dis-
trict of West Virginia. The question certi-
fied by the district court is as follows:

> Can the discharge of an employee for
> refusing to submit to urinalysis as part
> of a random drug test violate a substan-
> tial public policy of West Virginia and
> subject the employer to damages under
> *Harless v. First National Bank in Fair-
> mont,* [162 W.Va. 116,] 246 S.E.2d 270
> (1978) and [169 W.Va. 673,] 289 S.E.2d
> 692 (1982), when the employer has no

individualized suspicion of drug usage and the drug test is not prohibited by state statute?

After a review of the arguments of the parties in this matter and all the matters of record submitted before this Court, we are in partial agreement with the district court's answer.

According to the facts submitted before the district court, the plaintiff, Edward P. Twigg, was hired in February, 1978, as a draftsman for Hercules Corporation d/b/a Allegany Ballistics Laboratory (hereinafter referred to as Allegany) in Mineral County, West Virginia. Allegany was in the business of manufacturing highly explosive and dangerous fuels.

During his employment at Allegany, Twigg performed his job satisfactorily which is indicated in the record by the fact that he received numerous pay increases, positive evaluations and promotions. The position which he last held at Allegany was that of material planner, which required him to assist in the maintenance of the stock of supplies needed to conduct the defendant's business. It is unclear from the record before this Court whether Twigg's duties actually brought him into physical or direct contact with the explosive fuels or other potentially dangerous ingredients.[1]

In December, 1984, the defendant implemented a policy of mandatory, random drug testing for its employees at Allegany. On February 10, 1986, Hercules promulgated its revised policy for drug and alcohol testing. This revised policy became effective on March 1, 1986. During 1986, the defendant twice selected the plaintiff for random drug testing with each test providing a negative result. Twigg communicated to his superiors at Allegany his objections to the mandatory, random drug

testing policy; however, he did not refuse to submit to the testing on either of these two occasions.

On July 29, 1987, plaintiff's supervisor informed him that he had once again been selected for a urinalysis drug test to be administered on that day. Twigg once again informed his supervisors that he was opposed to the drug testing. The defendant's management advised plaintiff that if he did not submit to the drug test, he would be terminated from his employment with the corporation. The plaintiff did refuse to submit to the urinalysis and consequently was discharged by Hercules on July 29, 1987.

The question of whether discharge of an employee for refusing to submit to mandatory random drug testing violates substantial public policy in West Virginia is one of first impression for this Court. The plaintiff argues that the defendant, Hercules Corporation, violated a substantial public policy by discharging the plaintiff for his refusal to submit to random drug testing since the defendant had no individualized suspicion of drug usage by the plaintiff[2] and therefore lacked any sufficient justification for the testing. The defendant, on the other hand, contends that there is no substantial public policy in West Virginia which prohibits mandatory random drug testing of employees in the private sector because (1) there is no legislation prohibiting such testing; (2) constitutional proscriptions do not apply to private sector conduct; and (3) common law principles cannot constitute a "substantial public policy" where the issues are "fairly debatable or controversial" and thus better left to the legislature;[3] and, in any event, the common law right of privacy does not prohibit random drug testing.

1.  While the facts submitted in the certification order reflect that Twigg's work did not bring him into physical or direct contact with the fuels or their ingredients, Twigg's testimony in deposition revealed that his duties regularly required him to visit the following "critical areas" of the plant: a) areas containing rocket motors into which propellant had been cast; b) the "ignitor room" where the ignition systems for the rocket propellant were built; and c) the area

containing the "ignitor sticks," the explosive powder which went into the ignitors.

2.  The certification order prepared by the district court states that "[d]efendant had no basis for believing that plaintiff had recently used any illegal drugs."

3.  *See* Syl. Pt. 3, *Yoho v. Triangle PWC, Inc.,* 175 W.Va. 556, 336 S.E.2d 204 (1985).

This Court first dealt with the issue of employers being held liable where an employee's discharge contravenes a substantial public policy in *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978). In *Harless,* a bank employee was allegedly discharged after he attempted to bring to the attention of the bank's vice-presidents, and a member of the bank's board of directors, the fact that the bank " 'had intentionally and illegally overcharged customers on prepayment of their installment loans and intentionally did not make proper rebates,' " all in violation of state and federal consumer credit and protection laws. *Harless,* 162 W.Va. at 118, 246 S.E.2d at 272.

We recognized in the *Harless* case a new cause of action for at-will employees who are discharged when the employer's motives for such discharge contravene a substantial public policy. *Id.* Further, this Court opined that

[w]e have no hesitation in stating that the Legislature intended to establish a clear and unequivocal public policy that consumers of credit covered by the Act [West Virginia Consumer Credit and Protection Act, W.Va.Code §§ 46A–1–101 to –107] were to be given protection. Such manifest public policy should not be frustrated by a holding that an employee of a lending institution covered by the Act, who seeks to ensure that compliance is being made with the Act, can be discharged without being furnished a cause of action for such discharge.

162 W.Va. at 124, 246 S.E.2d at 276.

Subsequently, in *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984), we dealt with whether the discharge of an employee for refusal to take a polygraph test as a condition of employment violated substantial public policy. Specifically, the facts in *Cordle* indicate that when employees were hired as cleaning maids to work at a "Holiday Inn" they signed agreements which provided that they would take polygraph examinations when required by the employer. The plaintiffs subsequently were informed that the polygraph tests were to begin soon; however, when that time arrived, the plaintiffs refused to submit to the examination. *Cordle,* 174 W.Va. at 323–324, 325 S.E.2d at 112–13.

This Court reaffirmed its previous decisions which acknowledge that "[i]n West Virginia, a legally protected interest in privacy is recognized," [4] and further opined that

it is contrary to the public policy of West Virginia for an employer to require or request that an employee submit to a polygraph test or similar test as a condition of employment, and although the rights of employees under that public policy are not absolute, in that under certain circumstances, such as those contemplated by W.Va.Code, 21–5–5b [1983],[5] such a polygraph test or similar

4. Syl. Pt. 2, *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984) (citing *Roach v. Harper,* 143 W.Va. 869, 105 S.E.2d 564 (1958)).

5. W.Va.Code § 21–5–5b (1983) provides that:

No employer may require or request either directly or indirectly, that any employee or prospective employee of such employer submit to a polygraph, lie detector or other such similar test utilizing mechanical measures of physiological reactions to evaluate truthfulness, and no employer may knowingly allow the results of any such examination or test administered outside this State to be utilized for the purpose of determining whether to employ a prospective employee or to continue the employment of an employee in this State: Provided, that the provisions of this section shall not apply to employees of an employer authorized to manufacture, distribute or dispense the drugs to which article five [§ 30–5–1 et seq.], chapter thirty applies, excluding ordinary drugs as defined in section twenty-one [§ 30–5–21], article five, chapter thirty: Provided, however, that the provisions of this section shall not apply to law enforcement agencies or to military forces of the State as defined by section one [§ 15–1–1], article one, chapter fifteen of the Code: Provided further, that the results of any such examination shall be used solely for the purpose of determining whether to employ or to continue to employ any person exempted hereunder and for no other purpose.

Even though our holding in *Cordle* referred to the above statute, it is important to note that the statute was not in effect at the time the facts for that case arose. Consequently, the basis for finding the existence of a substantial public policy at the time of the controversy was not the above statute.

test may be permitted, the public policy against such testing is grounded upon the recognition in this State of an individual's interest in privacy.

174 W.Va. at 327, 325 S.E.2d at 117.

■ In applying the holding of the *Cordle* case to the present case, it is unquestionable that since we do recognize a "legally protected interest in privacy" and have previously found that requiring employees to submit to polygraph examinations violates public policy based upon this privacy right, we likewise recognize that it is contrary to public policy in West Virginia for an employer to require an employee to submit to drug testing, since such testing portends an invasion of an individual's right to privacy.[6]

■ We do, however, temper our holding with two exceptions to this rule. Drug testing will not be found to be violative of public policy grounded in the potential intrusion of a person's right to privacy where it is conducted by an employer based upon reasonable good faith objective suspicion of an employee's drug usage or where an employee's job responsibility involves public safety or the safety of others.

In allowing mandatory drug testing where public safety or safety to others is of concern to the employer, we follow the example set by numerous courts which have permitted drug testing in such a situation.[7] The reasoning behind drug testing under this circumstance was best explained by the Supreme Court of Alaska in *Luedtke v. Nabors Alaska Drilling, Inc.,*

768 P.2d 1123 (Alaska 1989). The Alaska Supreme Court, in finding that a drug testing program initiated by a company which operated drilling rigs was not in violation of the state constitutional right to privacy, was not in violation of the implied covenant of good faith and fair dealing, and did not give rise to a cause of action for invasion of privacy, specifically relied upon public safety and the safety of other employees in its decision. *Id.* at 1130 and 1136.

The court in *Luedtke* reasoned that when the right to privacy was seeded against a public concern issue such as safety that

'we think this right [to privacy] must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it is private, that is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated.'

*Id.* at 1135 (quoting *Ravin v. State,* 537 P.2d 494, 504 (Alaska 1975), *cert. denied sub nom. Smith v. Washington,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980)).

■ Where a business is engaged in an activity which involves either public safety or safety concerns for others, we find that

---

**6.** Compare with other jurisdictions which have refused to find that random drug testing violates an individual's right to privacy or a substantial public policy. *See Johnson v. Carpenter Technology Corp.,* 723 F.Supp. 180 (D.Conn.1989); *Ensor v. Rust Eng'g Co.,* 704 F.Supp. 808 (E.D. Tenn.1989); *Greco v. Halliburton Co.,* 674 F.Supp. 1447 (D.Wyo.1987); *Singleton v. Searail Indus., Inc.,* 674 F.Supp. 1451 (S.D.Ala.1987); *Jennings v. Minco Technology Labs, Inc.,* 765 S.W.2d 497 (1989); *Casse v. Louisiana Gen. Serv.,* 531 So.2d 554 (1988), *appeal denied,* 533 So.2d 375 (1988).

**7.** The following courts have upheld drug testing when either public safety or the safety of others is at issue based upon the nature of the work: *Thomson v. Marsh,* 884 F.2d 113 (4th Cir.1989)

(court upheld random drug testing on certain civilian employees at a chemical weapons plant because of governmental interest in safety); *Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir.1987) (court upheld drug testing where employee's duties involved direct contact with young school children and their physical safety); *Ensor v. Rust Eng'g Co.,* 704 F.Supp. 808 (E.D.Tenn.1989) (court upheld drug testing program of pipefitters working at a facility engaged in research of nuclear energy and coming into contact with fissionable materials); *Casse v. Louisiana Gen. Serv., Inc.,* 531 So.2d 554 (La.Ct.App.1988) (court upheld drug testing program where company had a legitimate safety concern since it was in the business of distributing volatile natural gas).

there exists a legitimate reason for the implementation of a drug testing program since a drug-impaired employee would potentially increase the risk of harm to others. However, there must be a showing by the employer that the employees required to undergo such testing have responsibilities or duties which are connected to the safety concerns of others. Thus, in the present case, it is obvious that a company involved in manufacturing highly explosive and dangerous fuels does employ individuals who, if drug-impaired, could increase the risk of harm to others, whether they are members of the general public or other employees. We are unable, however, to ascertain from the record before this Court whether the plaintiff's job responsibilities involved either the safety of others or public safety.

We now turn to the imposition of a reasonable suspicion standard in situations that do not involve public safety or safety of others. The plaintiff argues that had the employer's drug testing policy included an individualized suspicion standard it would not have violated any public policy; absent that individualized or reasonable suspicion standard, a violation of a substantial public policy occurs since the employer is effectively conducting an unwarranted, nonconsensual search. This argument is based not only on the fourth amendment to the United States Constitution, but article 3, section 6 of the West Virginia Constitution.

Generally, courts have held that "[t]he proscription against unauthorized searches and seizures embodied in ... the Fourth Amendment to the United States Constitution ... applies exclusively to government or state action." *Monroe v. Consolidated Freightways Inc.*, 654 F.Supp. 661 (E.D. Mo.1987) (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)) (court found that claim that corporate employer's institution of a drug-testing policy was violative of rights of supervisory personnel under fourth amendment was insufficient to state a cause of action since claim addressed purely private conduct and the state and federal proscriptions apply exclusively to government or state actions). Consequently, "because any constitutional limits apply only to drug testing involving an element of state action, the constitutional questions do not, of their own force, hamper private employers." Comment, *Employee Drug Testing—Balancing the Interests in the Workplace: A Reasonable Suspicion Standard*, 74 Va.L.Rev. 969, 973 (1988) (hereinafter referred to as *Employee Drug Testing*). Therefore, generally a private employer can conduct drug testing without having to concern themselves with requirements of the fourth amendment.

However, since this Court now recognizes that mandatory drug testing violates a substantial public policy of this state based on the right to privacy under the *Cordle* analysis, and "[b]ecause ... [the] fourth amendment claim ... is much stronger and subsumes the privacy claim, the invasion of privacy issue is rarely addressed separately from the fourth amendment issue in drug-testing cases." *Id.*, at 977. Consequently, we must determine what type of probable cause a private employer must have prior to conducting drug testing due to the substantial public policy issues involved.

We recognize that the protections provided by the fourth amendment and state constitution are not absolute. Thus we recognize that the imposition of an obligation upon the employer to meet the high standard of probable cause before conducting a drug test on an employee would place an intolerable burden upon the employer. *See O'Conner v. Ortega*, 480 U.S. 709, 722–26, 107 S.Ct. 1492, 1500–02, 94 L.Ed.2d 714 (1987). That is why we choose to impose the lesser standard of reasonable suspicion upon the employer.[8] Drug testing conducted by an employer utilizing this standard will not violate public policy "[b]ecause the

---

8. The United States Supreme Court has recognized the validity of the reasonable suspicion standard in the following cases. *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989),

*National Treasury Employees v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), *O'Conner v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

employer has a legitimate interest in curtailing the use of illicit drugs in the workplace, [and] courts have endorsed drug testing when the standards used to determine who should be tested were reasonable." *Employee Drug Testing, supra* at 976 (footnotes omitted). Further, "[n]o court has held that testing on the basis of 'reasonable suspicion' of drug use violates the fourth amendment." *Id.* at 976–77 (footnote omitted).

In placing this minimum standard upon the employer which must be met prior to conducting drug testing we acknowledge not only the employer's right to ensure the efficient and proper operation of his or her particular workplace, but also the employer's right to be free from potential liability brought on by an employee's drug usage which may ultimately result in harm to the others or in mismanagement, misfeasance or incompetence in the workplace. *See O'Conner,* 480 U.S. at 724, 107 S.Ct. at 1501, 94 L.Ed.2d at 727. However even in recognizing these concerns of the employer, since we have previously held that " 'the right to privacy is an individual right that should be held inviolate,' " we refuse to allow an employer to intrude upon this right of his employee absent some showing of reasonable good faith objective suspicion, unless the employer can articulate either a public safety concern or concern for the safety of other employees. *Cordle,* 174 W.Va. at 327, 325 S.E.2d at 116 (quoting *Roach v. Harper,* 143 W.Va. 869, 876, 105 S.E.2d 564, 568 (1958)). To hold otherwise would effectively render an employee's right to privacy meaningless.

Having answered the certified questions, this case is dismissed from the docket of this Court.

Certified question answered.

BROTHERTON, J., dissents and files a dissenting opinion.

We do note that in *Skinner* and *National Treasury Employees* the Supreme Court did not apply the reasonable suspicion standard due to overriding concerns for public safety which we have already addressed. It was implied by the Court, however, that absent the public safety concerns, or other legitimate substantial government interest, the reasonable suspicion standard must be met. *See National Treasury Employees,* 489 U.S. at 678–79, 109 S.Ct. at 1397, 103

BROTHERTON, Justice, dissenting:

I dissent to the majority's opinion for one reason: How can an attempt to create a drug-free environment be against the public policy of this State? The majority admits that "generally a private employer can conduct drug testing without having to concern themselves with requirements of the fourth amendment." *See* majority opinion at p. 159. Despite this conclusion, however, the majority quickly discovers a public policy exception which negates the finding. Quoting *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984), this Court held that:

[i]t is contrary to the public policy of West Virginia for an employer to require or request that an employee submit to a polygraph test or similar test as a condition of employment, and although the rights of employees under that public policy are not absolute, in that under certain circumstances, such as those contemplated by V.Va.Code, 21–5–5b [1983], such a polygraph test or similar test may be permitted, the public policy against such testing is grounded upon the recognition in this State of an individual's interest in privacy.

*Id.* at syl. pt. 3.

In relying upon this case, the majority ignores the fact that the result in *Cordle* was based upon a direct statutory provision which prohibited an employer from requiring that an employee undergo "a polygraph, lie detector, or other such similar test utilizing mechanical measures of physiological reactions to evaluate truthfulness...." [1] Thus, since the legislature addressed the issue of polygraph tests, the Court in *Cordle* was correct in assuming that there was a public policy against such tests.

L.Ed.2d at 710–11. Again, however, these cases were decided in the context of public employers. However, their reasoning is instructive.

1. Even without the privacy issue, the holding in *Cordle* does not forbid drug testing. West Virginia Code § 21–5–5b (1983) only discusses tests "utilizing mechanical measures of physiological reactions to evaluate truthfulness...." This obviously does not include drug testing.

However, no indication of legislative intent exists in this case. There is no statute which prevents drug testing. While I agree that a right to privacy exists in this State, it is subject to a private employer's right to insure that their work place is drug-free. I believe that an employer is entitled to know whether his employees are using drugs which may affect their work performance and, in some cases, the safety of others at the work place.

The majority does not suggest that the employer in this case chose Twigg for testing based upon an improper reason. Instead, the decision appears to be based solely upon an all encompassing privacy right which exists virtually to the exclusion of all other rights. I cannot agree, nor can I believe that the people of this State intended such a result.